SANCHELIMA INTERNATIONAL, INC., and
SANCHELIMA INTERNATIONAL S. DE R.L. DE
C.V.,

                    Plaintiffs,

    v.                                                    OPINION & ORDER

WALKER STAINLESS EQUIPMENT COMPANY,                            16-cv-644-jdp
LLC, BULK SOLUTIONS, LLC, and
BULK TANK INTERNATIONAL, S. DE R.L. DE
C.V.,

                    Defendants.

      This is a contract case. Plaintiffs are affiliated companies that the court will refer to collectively as "Sanchelima," except when it's necessary to refer to one of them separately. The court will take the same approach with defendants and refer to them as "Walker."

      Walker manufactures dairy silos; Sanchelima sells and distributes dairy silos in Latin America. In a written distribution agreement, Walker designated Sanchelima to be its exclusive distributor of dairy silos in 13 Latin American countries. Sanchelima contends that Walker breached the contract by selling diary silos directly to customers in Sanchelima's territory, so Sanchelima sued for the resulting lost profits. In response to the suit, Walker terminated the distribution contract and filed counterclaims alleging that Sanchelima was first to breach the contract by failing to use its best efforts, to maintain accurate records, to provide quarterly reports, and, most important, to meet the annual revenue target for 2013, the first year of the agreement.

The case was tried in a two-day bench trial. This opinion sets out the court's findings of fact and conclusions of law as required under Federal Rule of Civil Procedure 52. The court finds for Sanchelima on its breach of contract claim and against Walker on its counterclaims and affirmative defenses. Sanchelima is entitled to $778,306.70 in lost profits.

## PLAINTIFFS' *DAUBERT* MOTION

The court begins with an evidentiary issue. Prior to trial, the court denied Sanchelima's motion to exclude the testimony of Walker's expert, Leonardo Giacchino, insofar as it related to Giacchino's qualifications; the court deferred ruling on whether Giacchino's methods were so unreliable as to be inadmissible. Giacchino, an economist, opined that Sanchelima would have achieved 10 percent of the Mexican dairy silo market—which he valued at more than $50 million annually—within five years had it used its best efforts to market Walker's products. Giacchino also criticized the calculations of Sanchelima's expert, Sheri Schultz, used to determine Sanchelima's average gross profit margin. Giacchino's criticisms of Schultz are not at issue in Sanchelima's motion.

After hearing Giacchino's testimony, the court will grant the remainder of Sanchelima's *Daubert* motion and exclude Giacchino's testimony about the size of the Mexican dairy silo market and his testimony that Sanchelima should have been able to capture 10 percent of the market. Giacchino's testimony is inadmissible for several reasons. Expert testimony is admissible only if the expert's opinions are based on reliable methods and reasoning, among other things. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). Walker, as the proponent of the expert evidence, bears

the burden of establishing that the expert's testimony is reliable. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

Some of the problems with Giacchino's testimony stem from his use of a report that he specially commissioned from Market Data Forecast (MDF), a market research firm, to determine the size of the Mexican dairy silo market. Giacchino's report, Dkt. 94-1, disclosed his reliance on the MDF report and included a copy of the report as an exhibit. Giacchino also cited and relied on several email communications from MDF to Giacchino's consulting firm. At trial, Giacchino testified that he could have done the type of analysis in the MDF report himself, but that it was less expensive to commission the analysis from MDF. He testified that he had spot-checked aspects of the MDF report, and that he had used MDF before and found MDF to be generally reliable.

Walker argues that Giacchino may rely on the report under Federal Rule of Evidence 703 because it is the type of data that economists regularly rely upon. This argument misses the point. "Rule 703 does not necessarily allow a witness to rely on the methodology of another expert, if that expert's methodology would be deemed unreliable under *Daubert*." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 789 (7th Cir. 2017) (quoting *Tajonera v. Black Elk Energy Offshore Operations, LLC*, No. 13-0366, 2016 WL 3180776, at *11 (E.D. La. June 7, 2016)). The MDF report is actually an independent expert opinion that must pass muster under *Daubert*.

The MDF report has two fundamental problems. First, the MDF report was not disclosed in compliance with Rule 26, which would have required additional disclosure of the people who prepared the report, their qualifications, and their litigation history. This deficiency was not harmless, because it deprived Sanchelima of full opportunity to impeach the report.

Second, and more important, the MDF report does not at all explain either the underlying data or methods used to reach its critical finding—that the Mexican dairy silo market was worth at least $50 million annually. *See* Dkt. 94-2 (Section 6 and especially Table 1). In the disclaimer at the end of the report, MDF says:

> Quantitative market information is based primarily on interviews and therefore, is subject to fluctuation. Market Data Forecast takes no responsibility for any incorrect information supplied to us by manufacturers or users.

*Id.* at 14. The bottom line is that neither Giacchino nor the MDF report discloses how they reached the critical conclusion about the size of the dairy silo market, other than to say that it was based on some unspecified interviews. This fundamental unreliability infects the rest of Giacchino's opinion about Walker's damages.

And there is yet another problem with Giacchino's analysis. Giacchino theorizes that because there are 10 providers of dairy silo equipment in the Mexico market, had Sanchelima used its best efforts, it would have been able to capture a proportionate share of the market— 10 percent. Giacchino called this a conservative estimate, given that Walker is one of the two market leaders in dairy silos in Mexico. But Giacchino's theory doesn't account for several other significant factors that would affect Walker's market share. The evidence at trial showed that Walker offers a premium product at a high price and that the Mexican market is price-sensitive. Giacchino's analysis did not account for the possibility that the premium brand might not achieve a proportionate market share. The evidence also demonstrates that *used* dairy silos capture a significant share of the Mexican market. The MDF report says nothing about used silos, but Giacchino's report says that an MDF email confirmed that the MDF market estimate includes used silos. Dkt. 94-1, at 46 and n.81. But Giacchino does not explain what share of the market would be served by used equipment, and the evidence at trial suggested that used

4

silos were Sanchelima's main competition. Finally, Giacchino did not consider the fact that before the distribution agreement, Sanchelima had been selling Walker equipment in Mexico for decades on a non-exclusive basis without achieving anything close to $5 million per year. Giacchino's so-called conservative forecast that Sanchelima could achieve $5 million in annual sales within five years, or even a consistent $1 million in annual sales beginning in the first year of the agreement, is rank speculation.

Giacchino is a well-credentialed economist, but his opinions about Walker's damages are unreliable. The court will grant Sanchelima's *Daubert* motion.

## FINDINGS OF FACT

The court finds the following facts from the evidence adduced at trial.

Defendant Walker Stainless Equipment Company, LLC, manufactures and sells custom-made stainless steel vessels for storing and processing various liquid and semi-liquid products, such as dairy products. Its members are citizens of Indiana and Delaware, but its manufacturing plants are located in Wisconsin. It is capable of manufacturing many of its vessels according to the 3-A Sanitary Standards, a set of voluntary standards for dairy processing equipment embraced by the dairy industry in the United States that require, among other things, that (1) the interior surface of the tank be at a certain level of smoothness and (2) the interior welds be ground and polished. These features facilitate thorough cleaning and thus inhibit contamination. One of Walker's main products, the one at the heart of this lawsuit, is a vertical, insulated storage vessel known as a "dairy silo." "Walker" is a well-respected premium brand in this industry.

For approximately 30 years, plaintiff Sanchelima International, Inc., (a citizen of Florida) bought goods from Walker, shipped them to Mexico, and resold them at a markup to its customers. Those customers were businesses in the dairy industry relying on Sanchelima, and particularly its owner, Juan Andres Sanchelima, to create a complete dairy processing system. Because of increasing transportation costs, Sanchelima's sales of Walker products had declined in recent years.

In 2012, Walker acquired defendant Bulk Tank International, S. de R.L. de C.V., a Mexican company (whose members are citizens of Indiana and Delaware) that manufactured tank trailers at a plant in San Jose Iturbide, Mexico. Walker then approached Sanchelima, explaining that it planned to begin to manufacture dairy silos in the Bulk Tank plant, thus cutting distribution costs and making Walker products more competitive in the Mexican market. It wanted Sanchelima's help to develop the Mexican market. Although Walker made no commitments regarding the Bulk Tank plant in the parties' distribution agreement, the potential for manufacturing silos at the Bulk Tank plant motivated the parties to enter the agreement.

The parties began negotiating a distribution agreement. Walker proposed making Sanchelima an exclusive distributor with a few exceptions for specific companies that Walker could sell to directly; Sanchelima wanted no exceptions. During the negotiations, Sanchelima established a Mexican corporation, Sanchelima International, S. de. R.L. de C.V., (whose members are citizens of Mexico and Florida) to operate in Mexico under the distribution agreement.

On April 22, 2013, the parties entered into the distribution agreement. The agreement named both Sanchelima companies as the "distributors" and named Walker, Bulk Tank, and

another affiliated company, Bulk Solutions, LLC, (whose members are citizens of Indiana and Delaware) as the "manufacturers." The agreement made Sanchelima in some sense Walker's "exclusive" distributor; the scope of that exclusivity is at the heart of the parties' dispute.

Two paragraphs within section II of the agreement address exclusivity. The first paragraph makes Sanchelima the exclusive distributor of "Products" to the "Dairy Industry" in the "Territory":

> A. **Appointment and Acceptance.** Subject to the terms and conditions of this Agreement, Manufacturers hereby appoint the Distributors to act as their exclusive distributor to promote, sell and distribute Products to Persons in the Dairy Industry whose principal place of business is in the Territory and who agree to use the Product solely in the Territory, and each Distributor accepts such appointment. Without limiting the foregoing, Distributors shall not sell or distribute any Products to: (x) any Person whose principal place of business is within the United States, even if the Product would be delivered or exported by Distributor or the Customer to the Territory, or (y) any Person who Distributor knows or has reason to believe will transfer or install the Products outside of the Territory.

Dkt. 39-1, at 3. In the second paragraph, defendants agree that they will not sell "Products" to third parties in the "Territory":

> B. **Manufacturers' Agreement.** During the Term of this Agreement, each Manufacturer agrees not to enter into an agreement with any Third Party for the promotion, sale and/or distribution of Products within the Territory; *provided, however,* Manufacturers shall have no responsibility or liability should one or more Third Parties promote, distribute and/or sell any Products in the Territory without Manufacturers' written authorization. . . . .

*Id.*

The agreement defines "Products" as the following items manufactured by Walker, Bulk Solutions, or Bulk Tank:

1. Walker Dairy Silos

2. Walker Dairy Process Vessels, including, without limitation, Multi-mixer, PX Y PZ-ST, PZ-CB, PZ-CR, PZ-K, Hi-Mix and Liqui-Mixer

3. Walker Dairy Storage Vessels

4. Walker Agitators and Mixers

5. Spare parts for all of the foregoing

*Id.* at 2, 18. The specific products listed in item number 2 include some that are not specific to dairy processing. The agreement defines "Person" to mean any individual or business entity. *Id.* at 2. It defines "Dairy Industry" to mean "the business of processing and/or handling of milk, milk products and/or milk by-products, including without limitation milk, cheese, ice cream, yogurt, cream cheese, etc." *Id.*

A few other provisions of the agreement are also at issue in this lawsuit. The distributors agreed to "use best efforts in achieving and exceeding the applicable Revenue Target" each year. *Id.* at 3. (The revenue target for 2013 was $1,000,000. *Id.* at 19. The parties did not set any subsequent revenue targets, even though the agreement called for them to do so.) The agreement provided a specific remedy for a failure to meet the revenue target:

> Should Distributors fail to meet the applicable Revenue Target in any two (2) consecutive years, then Manufacturers may either convert Distributors' rights pursuant to Section II(A) from exclusive to non-exclusive rights or terminate such Distributors' rights pursuant to Section II(A) in one or more countries within the Territory, in each case upon providing sixty (60) days prior written notice to the Distributor.

*Id.* at 2.

The distributors also agreed to "keep complete and accurate books and records relating to the marketing, sales, distribution, installation, servicing and maintenance of Products, and

Customer Records separate from the books and records relating to other products." *Id.* at 8. And they agreed to send the manufacturers "a written report providing a brief summary of . . . new leads discovered . . . in the Territory." *Id.* They also agreed not to delegate their rights or obligations to a third party or "use any external sales representatives or resellers." *Id.* at 3.

The agreement also contained a no-waiver provision:

> The failure of either party to enforce, at any time or for any period of time, any provisions of this Agreement shall not be construed as a waiver of such provision or of the right of such party thereafter to enforce such provision.

*Id.* at 15.

Finally, the agreement provided two methods of termination. Any party could terminate on 90 days' written notice to the other party or upon mutual written agreement. A party could also terminate for cause

> When another Party has failed to perform or meet any material term, condition, or obligation of this Agreement, and, if curable, has failed to correct the same within thirty (30) days after written notice of the failure and, if not curable, has failed to take reasonable efforts to prevent such failure in the future.

*Id.* at 10.

Upon signing the agreement, Sanchelima took steps to market Walker products in Mexico. It hired sales representatives for its Mexico office, attended trade shows in Mexico to promote Walker dairy silos, and followed up on leads, including meeting with representatives of Nestlé Mexico, S.A. de C.V., the Mexican arm of the multinational food and beverage company, to discuss Nestlé's plans to build an infant-formula plant in Ocotlán. For its part, Walker assigned a manufacturer's representative, Robert Sawyer, to work with Sanchelima to promote sales of Walker equipment in Mexico. Walker took no other affirmative efforts to

promote or market its products in Mexico or any other part of the territory covered by the agreement.

Limitations at the Bulk Tank plant impeded Sanchelima's efforts to market Walker equipment. The plant wasn't able to manufacture silos until it was expanded, and the expansion wasn't complete until January 2015. Until then, Sanchelima still had to transport silos from Wisconsin, which added costs that made it difficult to compete in Mexico's price-sensitive market.

On July 21, 2014, Walker sold five silos to SIT Group, a business located in France, for $605,216.64. The silos were to hold vegetable oils—an ingredient in some dairy products—and were to be shipped to a Mondelez factory in Monterrey, Mexico. (Mondelez makes various snacks and candies.) On July 30, 2014, Walker sold a silo to Eskimo, S.A., a Nicaraguan ice cream business, for $66,237. The silo was to hold milk and was to be shipped to Managua, Nicaragua. On November 30, 2015, Walker sold two silos to Tetra Pak S.A. de C.V., the Mexican arm of the multinational dairy and food packaging and processing business, for $154,610. The silos were to hold palm oil and were to be shipped to Tetra Pak's Salinas Victoria, Mexico plant.

Around the same time, Walker responded to a request for proposals from a buying consultant, soliciting bids for equipment to be used at a Nestlé infant-formula plant in Ocotlán, Mexico. Walker submitted a proposal, which was accepted in part, and Walker sold 22 silos to Nestlé for $2,890,597.56. The silos were to hold whey, among other things, and were to be shipped to Nestlé's Ocotlán plant.

On January 21, 2015, Walker provided a quote to Alpura, a Mexican dairy products business, for four silos for $350,820. The silos were to hold milk. The quote estimated the silos

could be delivered in eight weeks, but Walker soon discovered that the estimate was wrong; because orders at the Bulk Tank plant were backed up, the silos could not be manufactured and delivered so quickly. Walker decided that this sale fell within the distribution agreement, and so it notified Alpura that Sanchelima would handle the sale. It also apologized to Alpura for the erroneous delivery estimate. When Alpura found out that the silos could not be delivered in eight weeks, it cancelled the sale.

Sanchelima notified Walker that it considered the Nestlé sale to be a breach of the distribution agreement. Efforts to settle the dispute were unsuccessful, and Sanchelima filed this lawsuit on September 21, 2016.

On January 9, 2017, Walker sold two processor tanks to Frutas y Conservas de Veracruz S.A. de C.V., a Mexican fruit juice business, for $159,534. The tanks were for citrus products.

In March 2017, Walker notified Sanchelima that it was terminating the distribution agreement without cause, effective May 10, 2017.

CONCLUSIONS OF LAW

The court concludes that it has subject matter jurisdiction on the basis of diversity under 28 U.S.C. § 1332(a) because the parties are completely diverse and the amount in controversy exceeds $75,000. The court will begin with Walker's counterclaims, which inform Walker's affirmative defenses, and then turn to Sanchelima's claims.

**A. Walker's counterclaims**

Walker asserts counterclaims for breach of contract and breach of the implied duty of good faith and fair dealing. It contends that Sanchelima failed to use its best efforts to promote Walker's products, failed to maintain accurate records, failed to provide quarterly reports, and

failed to meet the $1,000,000 revenue target for 2013 as required by the distribution agreement. It also contends that Sanchelima's performance of the agreement was in bad faith. Walker also asserts Sanchelima's breaches as an affirmative defense that would excuse Walker's non-performance under the contract.

To prevail on a breach-of-contract claim under Wisconsin law, Walker must establish (1) the existence of a contract; (2) a breach of the contract; and (3) damages from the breach. *See Matthews v. Wis. Energy Corp.*, 534 F.3d 547, 553 (7th Cir. 2008). To prevail on a claim for breach of the duty of good faith and fair dealing under Wisconsin law, Walker must show that Sanchelima "actually denied [Walker] the intended benefits of the contract." *Betco Corp. v. Peacock*, 876 F.3d 306, 310 (7th Cir. 2017).

Walker's counterclaims fail as a matter of law because it has no admissible evidence of any damages, a required element of its claim for breach of contract. Walker's damages theory was predicated exclusively on Giacchino's expert testimony, which the court has excluded as unreliable. And even if the deficiencies in Giacchino's evidence went only to the weight of the evidence, and not its admissibility, the court, as the trier of fact, would find Giacchino's testimony unpersuasive and find that Walker had failed to prove any damages.

Walker cannot assert the alleged breaches as affirmative defenses to Sanchelima's claims either, because it has not established that Sanchelima breached a material term of the distribution agreement or denied Walker the intended benefits of the agreement.

An obligation to use best efforts is a material term of the agreement. That obligation is expressly stated in the agreement (in section III.D.), and it would be an implied duty in an exclusive distribution contract anyway. *See, e.g.*, Wis. Stat. § 402.306(2).[1] Walker's post-trial

---

[1] Wis. Stat. § 402.306(2) provides: "A lawful agreement by either the seller or the buyer for

briefing on this point is so succinct that the court could deem it waived, but Walker makes two points: that Mexican sales were so low that sales volume alone shows a lack of best effort, and that Sanchelima made no effort at all in the other countries in the territory. Dkt. 121, at 19. Walker does not explain what standards should apply to this counterclaim, but under Wisconsin law, the obligation to use "best efforts" is essentially an obligation to use good faith in the performance of one's duties under the contract. *Metro. Ventures, LLC v. GEA Assocs.*, 2006 WI 71, ¶ 35, 291 Wis. 2d 393, 717 N.W.2d 58, *modified on other grounds*, 2007 WI 23, 299 Wis. 2d 174, 727 N.W.2d 502 (per curiam).

Walker has not established that Sanchelima failed to use its best efforts. The evidence shows that upon entering the agreement, Sanchelima established a Mexican entity to do business, hired a sales staff and an administrative staff, attended trade shows, and engaged in personal sales efforts. Both sides agree that advertising was not a main channel of marketing communications in this industry, so advertising expenditures are irrelevant. Both sides recognized Mexico as the most important part of the territory. So Sanchelima's lack of effort to develop the other countries when Mexico had not yet been developed does not show any bad faith or lack of best effort. Sanchelima's sales of Walker's products were disappointing, but Walker has not shown that the disappointment can be attributed to Sanchelima's failure to exercise its best efforts, particularly in light of the fact that the Bulk Tank plant was not capable of manufacturing silos for Sanchelima during most of the term of the agreement. Walker did not contractually obligate itself to expand the Bulk Tank plant, or even to make any silos there,

---

exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale."

but the lack of silo-manufacturing capacity at the Bulk Tank plant significantly undermines Walker's claim that the disappointing sales in Mexico were due to Sanchelima's lack of effort.

Walker has not shown that Sanchelima failed to maintain accurate records. It points only to Sanchelima's expert's testimony that when calculating Sanchelima's average gross profit margin percentage, she "did not use any transactions where [she] could not find matching sales invoices [from Sanchelima] with the purchase invoices [from Walker]." Tr. 2a, at 88:23–25.[2] The mere fact that there may have been a discrepancy between Sanchelima's and Walker's records does not show that Sanchelima is at fault; it's also possible that Walker's records were inaccurate.

Walker's main argument is that the revenue target was a material term, and that Sanchelima's failure to meet it is a material breach that excuses Walker's non-performance. Walker is right that a serious breach of an agreement by one party sometimes excuses performance by the other. *See Mgmt. Comput. Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 557 N.W.2d 67, 77–78 (1996). A breach is material when it is "so serious . . . as to destroy the essential objects of the contract." *Id.* (quoting *Appleton State Bank v. Lee*, 33 Wis. 2d 690, 148 N.W.2d 1, 3 (1967)). But even when a serious breach has occurred, the non-breaching party may waive the claim of materiality by its actions. *Id.*

Walker contends that it would not have entered the agreement without the $1 million revenue target for 2013, and that alone makes it a material term. But Walker's argument is belied by the terms of the agreement and the parties' conduct, which both show that the

---

[2] Citations to trial transcripts are by day, session, page, and line. Thus, "Tr. 2a, at 88:23–25," refers to the transcript from the second day of trial, morning session, page 88, lines 23 through 25.

revenue target was an aspirational goal rather than a hard quota. Nothing in the agreement expressly states that the revenue target is a material term, and the language of the agreement suggests otherwise. The very term "revenue target" suggests flexibility, and achieving the revenue target is not even stated as an obligation of the distributor. Rather, the distributor is obligated only to use "best efforts" to achieve the target. And the remedy provided for failure to meet the target applies only when the revenue target was not met in two consecutive years. *See* Dkt. 39-1, at section II.E. And the parties did not behave as though the 2013 revenue target were a material term. They did not set any revenue target for any subsequent year, and after the 2013 target was missed, the parties did nothing, and they pressed on as though the agreement were still in full force. Walker waived the materiality of the breach of the 2013 revenue target "by continuing to live with the contract as if it existed." *Mgmt. Comput. Servs.* 557 N.W.2d at 78 n.25.

Walker counters that the agreement has a no-waiver provision, pursuant to which the parties agreed that a party's failure to enforce a provision of the agreement is not a waiver of that party's right to do so. Dkt. 121, at 14 (citing Dkt. 39-1, at section XIV.G). Thus, Walker argues, it was entitled to hold Sanchelima's breach of the 2013 revenue target in reserve, not only allowing it to take its remedy at any time it chose, but also rendering Walker's performance of its obligations under the contract entirely voluntary after 2013. In other words, after 2013, only Sanchelima had any obligations under the distribution agreement; Walker was free to do as it pleased. It would be an understatement to say that such a reading of the agreement is unreasonable. Even if Walker did not waive the remedies provided in the agreement, its remedies are those provided in the agreement. The no-waiver provision did not excuse Walker's non-performance after Sanchelima missed the 2013 revenue target.

The failure to meet the first-year revenue target was not a breach of the agreement, material or otherwise. Likewise, the failure to provide reports, which is undisputed, and the failure to maintain records, even if it had been proven, are minor breaches of nonessential provisions of the agreement.[3] In sum, Walker's counterclaims and its affirmative defenses fail.

## B. Sanchelima's claims

### 1. Breach of the exclusivity provisions

At trial, Sanchelima focused on the five sales by Walker and the one attempted sale to Alpura described above. Sanchelima contends that each sale was a breach of the exclusivity provisions of the distribution agreement. Walker contends that the sales were not of *dairy* silos and therefore they did not fall within the exclusivity provisions, which left Walker free to sell non-dairy equipment in Mexico and the rest of the territory. The central dispute relates to the meaning of the term "dairy" as used in the agreement.

The court concludes that the distribution agreement is ambiguous about the scope of the exclusivity granted to Sanchelima. The ambiguity stems from the tension between section II.A, which appoints Sanchelima as Walker's exclusive distributor, and section II.B, which prohibits Walker from making certain sales. Ideally, the scope of the appointment in II.A would match the scope of the prohibition in II.B, but they do not match. In section II.A, Sanchelima is appointed as the exclusive distributor to sell "Products to Persons in the Dairy Industry." Section II.B simply restricts Walker from selling "Products within the Territory," with no

---

[3] Walker argues in its post-trial brief that Sanchelima breached the delegation-to-third-parties provision, too. It didn't list this claim in its answer, so it is forfeited, but regardless, the testimony to which Walker points does not support this claim—it concerns Sanchelima's commission payments, which do not necessarily indicate that Sanchelima used external sales representatives or resellers. *See* Tr. 2a, at 112:4–19.

express limitation to the dairy industry. According to Sanchelima, section II.B flatly prohibits Walker from selling its products in Mexico. According to Walker, section II.A leaves it free to sell products in Mexico, so long as its customers are not in the dairy industry.

Walker argues that the industry limitation on Sanchelima's exclusivity is implicit in section II.B because the term "Products" incorporates the restriction to the dairy industry. According to Walker, a "dairy silo" is a silo that holds milk, or at the very least is used in the production of dairy products. Sanchelima contends that the term "dairy silo" is a more generic term that applies to a type of storage vessel that has certain structural features, regardless of how it will ultimately be used.

The court begins by looking for guidance in the text of the agreement. The agreement defines Products to include five categories of things:

1. Walker Dairy Silos

2. Walker Dairy Process Vessels, including, without limitation, Multi-mixer, PX Y PZ-ST, PZ-CB, PZ-CR, PZ-K, Hi-Mix and Liqui-Mixer

3. Walker Dairy Storage Vessels

4. Walker Agitators and Mixers

5. Spare parts for all of the foregoing

Dkt. 39-1, at 18. Three of the five include the term "dairy," which lends some support to Walker's position. But the fourth item does not. And the specific products listed in item number 2 include some that are not specific to dairy processing. The court concludes that the definition of the term Products does not resolve the matter because the defined term Products includes some non-dairy equipment. And if the parties had intended that Walker would reserve

the right to sell products in Mexico, one would have expected that reservation to be more clearly stated, rather than implied through the definition of the term Product.

The definition of "Dairy Industry" does not completely resolve the issue either. The agreement defines Dairy Industry to mean "the business of processing and/or handling of milk, milk products and/or milk by-products, including without limitation milk, cheese, ice cream, yogurt, cream cheese, etc." *Id.* at 2. If the agreement had given Dairy Industry a broader definition that included foods other than those derived from milk, it would have supported Sanchelima's position that its exclusivity was broader, but it does not.

Because the exclusivity provisions are ambiguous, the court can consider extrinsic evidence to aid its interpretation. *See Town Bank v. City Real Estate Dev., LLC*, 2010 WI 134, ¶ 38, 330 Wis. 2d 340, 793 N.W.2d 476. Walker contends that any actual "dairy" silo must meet the 3-A Sanitary Standards. According to Walker, a dairy silo is one made to 3-A standards; any other silo is not a dairy silo. But Sanchelima introduced persuasive evidence that the 3-A standards are not universally followed in Mexico; dairy products sold in Mexico can be produced in equipment that is not 3-A compliant. There's no indication that the parties intended the term "dairy" to mean "3-A compliant" when they drafted the distribution agreement.

Sanchelima adduced evidence that it had sold Walker silos to customers for non-diary uses, and that Walker never refused to sell a silo to Sanchelima because it was destined for non-diary use. But this is irrelevant. Walker does not contend that Sanchelima was barred from selling Walker products outside the dairy industry; Walker contends only that Sanchelima's authority to sell outside the dairy industry was non-exclusive.

More persuasive is the evidence concerning the parties' understandings and actions before, during, and after negotiating the agreement. During the negotiations, Walker proposed exceptions for specific companies that it could sell to directly; Sanchelima refused those exceptions. This tends to support Sanchelima's position that the parties understood the final agreement to bar Walker from serving *any* customers in Mexico. And after the agreement was signed, there is no evidence that Walker actively marketed products in Mexico other than through Sanchelima. Walker did not have any representatives or distributors assigned to non-dairy customers in the territory. Some business did come Walker's way, resulting in the six sales at issue. It appears that those customers approached Walker about those sales, rather than the other way around. The evidence at trial was clear that Walker's only active marketing in the territory was through Sanchelima.

The most persuasive evidence is that the parties used the term "dairy silo" in the more generic sense as Sanchelima contends. The Walker representative who worked with Sanchelima, Robert Sawyer, testified that the term "dairy silo" denotes a type of insulated vertical storage tank, regardless of what it is used to store. *See* Tr. 1p, at 104:17–105:14. Walker's own website uses the term dairy silo in this way. *See* Plaintiffs' Exhibit No. 72.

The court concludes, based primarily on the usage of the term dairy silo and the parties' conduct, that the parties understood the agreement to grant Sanchelima the exclusive right to sell Walker products throughout the territory, and that it barred Walker from making direct sales in the territory.[4] Thus, Walker's sales to Nestlé, Eskimo, Tetra Pak, SIT Group, and Frutas each breached the agreement; so did Walker's attempted sale to Alpura.

---

[4] Section II.B prohibits Walker from engaging any third party as a distributor in the territory; it does not expressly prohibit Walker from making direct sales in the territory. But Walker has not argued that section II.B should be interpreted narrowly to apply only to third-party

Alternatively, even if Sanchelima's exclusivity was limited to the dairy industry, Walker's sales to Alpura, Eskimo, and Nestlé would violate the exclusivity provisions. The first two were sales for silos meant to hold milk; the third was for silos meant to hold whey and other unspecified ingredients for infant formula. The agreement defines "dairy industry" to include the processing of milk byproducts; infant formula is a milk byproduct. The sales to Tetra Pak, SIT Group, and Frutas would not be sales within the dairy industry, as those silos were not meant to hold milk byproducts, and there is not sufficient evidence that the silos would be involved in processing milk byproducts.

Walker raises a secondary issue concerning the scope of the territory, which might affect the status of the sale to SIT Group. Section II.A grants to Sanchelima the exclusive right to sell to customers whose principal place of business is in the territory. Walker sold silos to SIT Group, whose principal place of business is in France. The silos were shipped to a facility in Mexico owned by Mondelez, whose principal place of business is in the United States. Walker contends that because neither SIT Group's nor Mondelez's principal place of business is in the territory, the sale does not fall within the exclusivity granted in section II.A, and the sale is excluded from the agreement. Dkt. 121, at 11–12. But Walker's analysis is incomplete, because section II.B bars Walker from selling products in the territory, without regard to the customer's principal place of business. Again, in a well-drafted agreement, the scope of the territorial restrictions in sections II.A and II.B would match. But in this case, the court must reconcile conflicting provisions. The court concludes, for reasons explained above, that the parties

distributors.

intended Sanchelima to be Walker's exclusive distributor in the territory. Walker's sale to SIT falls squarely within the prohibition in section II.B, and thus it breached the agreement.

## 2. Damages

The final issue is damages. Sanchelima's theory is simple: all of the sales, and attempted sales, that Walker made in Mexico would likely have been made by Sanchelima but for Walker's breach. Sanchelima must show the fact of damages to a reasonable certainty. *See Mid-Am. Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1365 (7th Cir. 1996). Sanchelima has made that showing, with one exception. Sanchelima has a history of selling Walker products in Mexico; the sales are brand-driven; and Walker actually obtained purchase orders for all of the sales at issue. This evidence shows that Sanchelima would have been reasonably certain to make the sales that Walker was able to set up and close in Mexico. Although Alpura cancelled its order because the delivery date was misstated, the cancellation was due to an error committed by Walker's new employee; Sanchelima has shown with reasonable certainty that its experienced employees would not have made that error. But Sanchelima has not shown that it would have been reasonably certain to make the Eskimo sale in Nicaragua—there is no evidence that Sanchelima had any presence in that country.

Next the court must determine the amount of profit that Sanchelima would have made on those five sales. Plaintiffs' expert, accountant Sheri Schultz, opined that Sanchelima's average gross profit margin percentage was 23.01. Her testimony was well-supported and generally credible. It was not meaningfully impeached by Giacchino—he identified certain errors in her calculations, and she corrected those. His main remain criticism was not that her methods were unreliable, but that he, as an economist, would have used aggregate data rather than her brute-force method of examining each individual sale. The court sees no reason to

believe that Giacchino's aggregate method would produce a different result, or that his approach was actually any improvement at all over Schultz's analysis. The court finds that Schultz's calculation that Sanchelima's gross profit margin is 23.01 percent is sound.

The more difficult question is whether Sanchelima would have been able to make the sales at issue with its 23.01-percent markup. The evidence on this question was sparse: We know that Mexico is a price-sensitive market and that Walker won at least the large Nestlé contract by participating in a competitive bidding process. David Nick, Walker's vice president and general manager, testified that defendants had only "about" a 15-percent gross profit margin on the Nestlé sale, but that calculation was not supported by any data. *See* Tr. 2a, at 5:2–14. Presumably price mattered to Nestlé, and the other customers, to some degree. The court is not persuaded that Sanchelima would have made the same sales with a 23.01-percent markup simply added to Walker's sale price—it seems more likely that the parties would have negotiated to ensure that they both obtained reasonable profit at a price that would have allowed for the sale. Walker argues that this dooms Sanchelima's claims. But "[t]he reasonable certainty rule applies only to the *fact* of damages, not to the *amount* of damages." *Mid-Am. Tablewares*, 100 F.3d at 1367 (quoting Robert L. Dunn, *Recovery of Damages for Lost Profits* § 1.3). Where, as here, a defendant's breaches caused the difficulty in ascertaining lost profits, the amount of damages "may be approximated through just and reasonable inference." *Super Grp. Packaging & Distrib. Corp. v. Smurfit Stone Container Corp.*, No. 05-cv-156, 2006 WL 274779, at *4 (W.D. Wis. Jan. 27, 2006) (citing *Mid-Am. Tablewares*, 100 F.3d at 1365).

Walker was able to bid for the sales at issue without accounting for the cost of making the sales, whether in the form of a sales commission or the mark-up charged by its distributor. The evidence at trial showed that, historically, customers in Mexico who wanted Walker

equipment would pay Sanchelima's 23.01 percent markup added to the price that Walker quoted to Sanchelima. But here we do not know what price Walker would have quoted to Sanchelima; we know only what Walker charged the customer, which might have been a somewhat higher price than if Walker were making those sales through Sanchelima. So simply adding Sanchelima's mark-up to the price that Walker charged the customers might produce a windfall for Sanchelima.

So, to avoid a potential windfall to Sanchelima, the court will draw the reasonable inference that Sanchelima could have made these sales at Walker's final sale price, and back Sanchelima's 23.01-percent gross profit margin out of that price. The court recognizes that this assumption is not perfectly realistic (if the court accepts the conclusory testimony that Walker's profit margin was 15 percent) because it would mean that Walker would have supplied the products at a loss. But the court concludes that the evidence shows that customers would have paid the prices Walker charged, and that Sanchelima has shown that its profit on sales under the agreement would have been 23.01 percent. Calculating the damages in this manner represents a reasonable estimate of Sanchelima's damages, while guarding against a potential windfall to Sanchelima based on speculation that the customers might have paid more.

The court's approach yields total lost profits of $778,306.70, as calculated for each transaction below:

|  | Final sale price | Plaintiffs' profits |
|---|---|---|
| **SIT Group** | $605,216.64 | $113,210.59 |
| **Tetra Pak** | $154,610.00 | $28,921.03 |
| **Nestlé** | $2,890,597.56 | $540,709.29 |
| **Alpura** | $350,820.00 | $65,623.67 |
| **Frutas** | $159,534.00 | $29,842.11 |

That leaves one final issue: prejudgment interest. "The general rule is that prejudgment interest may be recovered only when damages are either liquidated or liquidable, that is, there is a reasonably certain standard of measurement by the correct application of which one can ascertain the amount he or she owes." *Teff v. Unity Health Plans Ins. Corp.*, 2003 WI App 115, ¶ 43, 265 Wis. 2d 703, 666 N.W.2d 38. Sanchelima conclusorily argues that it meets this standard because its damages have been computed, measured, and determined. *See* Dkt. 120, at 20. But as the discussion above shows, the amount of Sanchelima's damages was not reasonably certain until trial. Ascertaining Sanchelima's lost profits required resolution of factual issues, which bars an award of prejudgment interest. *See id.* ¶ 50 (reversing the trial court's award of prejudgment interest on damages for lost profits). Thus, Sanchelima is entitled to monetary judgment in the amount of $778,306.70.

ORDER

IT IS ORDERED that:

1. Plaintiffs' motion to limit defendants' expert testimony, Dkt. 94, is GRANTED in part.

2. Plaintiffs are entitled to monetary judgment in the amount of $778,306.70.

3. The clerk of court is directed to enter judgment in favor of plaintiffs on all claims and close this case.

Entered March 19, 2018.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge